215 F.3d 1304 (Fed. Cir. 2000)
 CAGUAS CENTRAL FEDERAL SAVINGS BANK Plaintiff, and MARIA VICTORIA VAZQUEZ, SEVERIANO CORDERO, MARIA VAZQUEZ, HILDA RUIZ, LORENZO MUNOZ FRANCO, FAUSTINO FRANQUIZ,ANA D. MARRERO and FELIX BALINAS, Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee.
 99-5084
 United States Court of Appeals for the Federal Circuit
 DECIDED: June 21, 2000
 
 Appealed from: United States Court of Federal Claims Judge Robert H. Hodges, Jr.
 Stephen G. Topetzes, Kirkpatrick & Lockhart LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief was Stavroula E. Lambrakopoulos.
 Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; and Gregory R. Firehock, Trial Attorney.
 John V. Thomas, Assistant General Counsel, Federal Deposit Insurance Corporation, of Washington, DC, for amicus curiae Federal Deposit Insurance Corporation. With him on the brief was Dorothy Ashley Doherty, Counsel. Of counsel was William A. Gray, of Washington, DC.
 Before PLAGER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and RADER, Circuit Judge.
 FRIEDMAN, Senior Circuit Judge.
 
 
 1
 An insolvent savings and loan association and several of its former members brought this action in the United States Court of Federal Claims seeking damages from the United States for the government's alleged breach of its contractual commitment to permit the association to use a particular favorable accounting treatment of the goodwill it had acquired in connection with its merger in the early 1980's with two financially troubled savings and loan associations. The regulatory authority ended that accounting treatment pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("1989 Act"), which prohibited that treatment. The Court of Federal Claims dismissed the complaint as barred by the statute of limitations and for failing to state a claim upon which relief may be granted. We agree with the trial court that the statute of limitations bars this suit, and therefore affirm its dismissal of the case on that ground.
 
 
 2
 * A. 1. The background facts relating to the savings and loan industry's financial problems out of which this case arose are described in United States v. Winstar Corp., 518 U.S. 839, 844-858 (1996). They may be summarized as follows:
 
 
 3
 In the early 1980's the savings and loan industry had a financial crisis that resulted because many firms had "long-term, fixed-rate mortgages created when interest rates were low; when market rates rose, those institutions had to raise the rates they paid to depositors in order to attract funds. When the costs of short-term deposits overtook the revenues from long-term mortgages, some 435 thrifts failed between 1981 and 1983." Id. at 845 (citations omitted). "While the regulators tried to mitigate the squeeze on the thrift industry generally through deregulation, the multitude of already-failed savings and loans confronted FSLIC [Federal Savings and Loan Insurance Corporation] with deposit insurance liabilities that threatened to exhaust its insurance fund." Id. at 846.
 
 
 4
 "Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of 'supervisory mergers.' . . . [T]he principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations . . . . [This would] permit[] the acquiring entity to designate the excess of the purchase price over the fair value of all identifiable assets acquired as an intangible asset called . . . '[supervisory] goodwill.' . . . The acquiring institutions [could] count supervisory goodwill toward their reserve requirements . . . ." Id. at 847-50.
 
 
 5
 "[T]he overall regulatory response of the early and mid-1980's was unsuccessful in resolving the crisis in the thrift industry. As a result, Congress enacted the [1989 Act, which] made enormous changes in the structure of federal thrift regulation," including eliminating supervisory goodwill as a capital asset and "establishing the Resolution Trust Corporation to liquidate or otherwise dispose of certain closed thrifts and their assets." Id. at 856 (citation omitted).
 
 
 6
 "The impact of [the 1989 Act's] new capital requirements upon institutions that had acquired failed thrifts in exchange for supervisory goodwill was swift and severe. [The regulatory agency] promptly issued regulations implementing the new capital standards along with a bulletin noting that [the 1989 Act] 'eliminates [capital and accounting] forbearances' previously granted to certain thrifts . . . . [M]any institutions immediately fell out of compliance with regulatory capital requirements, making them subject to seizure by thrift regulators." Id. at 857-58.
 
 
 7
 2. Winstar involved three suits filed in the Court of Federal Claims by entities that had acquired failed savings and loans associations pursuant to, as this court found, "negotiated contracts with the bank regulatory agencies that allowed them to include supervisory goodwill (and capital credits) as assets for regulatory capital purposes and to amortize that supervisory goodwill over extended periods of time." Winstar Corp. v. United States, 64 F.3d 1531, 1545 (Fed. Cir. 1995). The suits sought damages for the injuries the entities sustained as a result of the 1989 Act's prohibition upon the use of supervisory goodwill. The Supreme Court affirmed the conclusion of this court that "the Government breached these contracts when, pursuant to the new regulatory capital requirements imposed by [the 1989 Act] the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating respondents' net worth," and that "the United States is liable to respondents for breach of contract." Winstar, 518 U.S. at 870, 910. The Court remanded the case for further proceedings "[b]ecause the Court of Federal Claims ha[d] not yet determined the appropriate measure or amount of damages." Id. at 910.
 
 
 8
 B. On September 29, 1995 the Resolution Trust Corporation and the Department of Justice entered into an agreement tolling the statute of limitations. The agreement began with a number of "RECITALS," including the statements that "the RTC may possess certain claims against the United States arising out of the enactment of certain provisions of the" 1989 Act and its implementing regulations; "the RTC contends that these changes may have breached contractual obligations of the FHLBB to some institutions for which the RTC has been appointed receiver, or may have otherwise damaged these institutions. These claims shall be referred to herein as 'Goodwill Claims'"; "the RTC and the United States both desire to avoid litigation of these Goodwill Claims" and "both intend to try to resolve these Goodwill Claims, if any, at the appropriate time, by amicable measures in order to avoid costly and contentious litigation." The agreement then provided: "the parties agree to toll the statute of limitations that may apply to Goodwill Claims, as set forth below."
 
 
 9
 The first three operative provisions of the agreement were as follows:
 
 
 10
 1. The running of the statute of limitations for all Goodwill Claims the RTC may possess shall be tolled from the date of this Agreement to and including one hundred-thirty (130) days after the entry of either a final and unappealable judgment in [the Winstar case (in which such judgment has not yet been entered)].
 
 
 11
 2 During the first one hundred-twenty days of the period referred to in paragraph 1, the parties shall attempt to resolve amicably, without litigation, any and all Goodwill Claims that the RTC may then possess.
 
 
 12
 3. Following the conclusion of the one hundred-twenty day period specified in paragraph 2, the RTC shall have ten (10) days in which to file suit on any Goodwill Claim not amicably resolved by the parties. Any such claim filed by the RTC against the United States within this ten day period shall be deemed by the United States, for the purposes of computation of the statute of limitations, to have been filed on August 8, 1995, and the United States agrees that it will not raise the statute of limitations as a defense in that litigation.
 
 
 13
 C. The present suit was filed in the Court of Federal Claims on October 21, 1998 by Caguas Central Federal Savings Bank (Caguas), a mutual savings and loan association that is in receivership, and eight individuals who formerly were members and account holders of Caguas ("the Members"). Complaint, ¶¶ 23-31, 35. The complaint described the suit as a "derivative action" and stated that the individual plaintiffs "as members and account holders have an ultimate derivative interest in the Caguas Central Federal Bank Receivership Estate resulting from their right to any surplus." Id., ¶¶ 6, 38.
 
 
 14
 The complaint included the following allegations:
 
 
 15
 At the request of the federal regulatory agencies, Caguas in 1982 and 1984 acquired two insolvent savings and loan associations, United Federal and Home Federal. Id., ¶¶ 7, 55, 60. In so doing, it relied upon the regulatory agencies' agreement that "supervisory goodwill resulting from the merger would be counted as part of the regulatory net worth requirement." Id., ¶¶ 15, 16, 55. By enacting and implementing the 1989 Act, "the United States reneged on its contractual commitments concerning regulatory capital accounting, amortization, accretion period and other assistance and forbearances, for the United Federal and Home Federal acquisitions. [T]he government required Caguas to deduct immediately from its regulatory capital much of the goodwill acquired in the United Federal and Home Federal acquisitions." Id., ¶ 20. "[T]he Federal regulatory authorities . . . determined that with the exclusion from net worth of the supervisory goodwill, subordinated notes and other forbearances previously contracted with Caguas, Caguas could not comply with the new capital requirements," and placed Caguas in receivership. Id., ¶ 70.
 
 
 16
 The Federal Deposit Insurance Company, as the successor to the Resolution Trust Corporation and receiver of Caguas, "had the obligation to institute the present action on behalf of the receivership but has neglected to do so due to several conflicts of interests." Id., ¶ 35. "[T]hese conflicts of interest have caused the FDIC to fail to pursue claims against the United States of America that would inure to the benefit of the members, directors, officers, and account holders of Caguas . . . . [T]he FDIC has failed to take any steps to pursue claims against the United States of America related to the government's breach of its contractual commitments to Caguas regarding the treatment of supervisory goodwill." Id., ¶ 40. The individual "plaintiffs are now asserting these claims 'derivatively' on behalf of Caguas." Id.
 
 
 17
 The complaint contained eleven counts seeking damages on various theories, including breach of contract and just compensation for the taking of Caguas' property, and also sought restitution. See id., ¶¶ 79-124.
 
 
 18
 On the government's motion, the Court of Federal Claims dismissed the complaint "for lack of jurisdiction and for failure to state a claim for which relief may be granted." Caguas Central Federal Savings Bank v. United States, No. 98-804C (Ct. Fed. Cl. Mar. 1, 1999). In a short order, the court explained:
 
 
 19
 We do not address the issue of whether plaintiffs' allegations concerning breach of trust present a cause of action for which relief may be granted in this court because such an action would not be timely in any event. We view the "tolling agreement" as being strictly limited in its application to the parties, if it is enforceable at all. Plaintiffs point out a "principle of contract law that parties to a contract may create enforceable contract rights in an unspecified third party." (citations omitted). If so, the parties to the tolling agreement did not show an interest in creating any rights in these plaintiffs. For these reasons, the Clerk will dismiss plaintiffs' case for lack of jurisdiction and for failure to state a claim for which relief may be granted.
 
 
 20
 Id.
 
 II
 
 21
 A. A claim in the Court of Federal Claims must be "filed within six years after such claim first accrues." 28 U.S.C. § 2501 (1994). The complaint in this case was filed on October 21, 1998. For the suit to have been timely, the claims asserted must have accrued no earlier than October 21, 1992.
 
 
 22
 The complaint contended that the government breached its contractual commitment to permit Caguas to use supervisory goodwill when the 1989 Act banned that practice and the implementing regulations compelled Caguas to end it, thereby resulting in Caguas's receivership. Here, as is Ariadne Fin. Servs. Pty., Ltd. v. United States, 133 F.3d 874, 879-80 (Fed. Cir. 1998), "[b]efore . . . the critical date [of October 21, 1992,] the government had enacted a statutory prohibition on the use of supervisory goodwill and issued regulations enforcing this prohibition. It then issued a notice of intent to apply these regulations to thrifts . . . . The government ordered "'[a]ll savings associations presently operating with these forbearances . . . [to] eliminate them in determining whether or not they comply with the new minimum regulatory capital standards.'" The government took these actions well before October 21, 1992 and therefore, the claims in this case accrued more than six years before the complaint was filed and the suit was untimely.
 
 
 23
 B. To avoid the limitations bar, the Members invoke the tolling agreement. They contend (1) that they are third party beneficiaries of it and (2) that the agreement itself covers Caguas, in whose behalf they have brought this suit.
 
 
 24
 1. Ordinarily, only the parties to a contract have rights thereunder that they may enforce. See, e.g., First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999). The parties, however, may create rights for the benefit of third persons, which those persons may then vindicate and enforce as third party beneficiaries of the contract. See id. For there to be third party beneficiaries, however, "the contract must 'reflect[] the express or implied intention of the parties to benefit the third party.' . . . The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby." State of Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1997) (quoting Schuerman v. United States, 30 Fed. Cl. 420, 433 (1994)); see also Restatement (Second) of Contracts § 302(1) (1979).
 
 
 25
 Nothing in the tolling agreement, however, even suggests, much less establishes, that the parties to it intended to toll the statute of limitations for suits brought by members of an insolvent savings and loans association on behalf of the association. The agreement, which tolls the "running of the statute of limitations for all Goodwill Claims the RTC may possess" until 130 days after the final disposition of Winstar, provides that during the first 120 of those 130 days "the parties [the Resolution Trust Corporation and the Department of Justice] shall attempt to resolve amicably, without litigation, any and all Goodwill Claims that the RTC may then possess"; that, after the 120 day period, "the RTC shall have ten (10) days in which to file suit on any Goodwill Claim not amicably resolved by the parties"; and that "[a]ny such claim filed by the RTC against the United States within this ten day period shall be deemed by the United States, for the purposes of computation of the statute of limitations, to have been filed on August 8, 1995, and the United States agrees that it will not raise the statute of limitations as a defense in that litigation." On their face, these provisions toll the statute of limitations only for cases filed by the Resolution Trust Corporation on Goodwill Claims it possesses. They do not toll the statute on claims filed not by the Resolution Trust Corporation, but by former members of an insolvent savings and loans associations on behalf of the association.
 
 
 26
 This conclusion is supported by the purpose of the tolling agreement. It reflected the parties' hopes and anticipation that once Winstar finally was decided--a decision that presumably would define the governing principals for these Goodwill Claims--the parties would be able to settle the claims "without litigation." The agreement provided that for claims not settled within the 120 days, the Resolution Trust Corporation would have 10 additional days to file suit, and those suits should be deemed to have been filed on August 8, 1995, which was six years after the 1989 Act became effective.
 
 
 27
 There is no reason why the parties to the tolling agreement would have wished to extend the tolling provisions to cover suits brought by savings and loans association members on behalf of their association. To permit such suits while the Resolution Trust Corporation claims were tolled would be inconsistent with the theory underlying the tolling agreement that, once Winstar finally was decided, the other claims could be "amicably" resolved "without litigation." The purpose of the tolling agreement was "to avoid litigation of these Goodwill Claims," not to permit litigation of those claims by third persons.
 
 
 28
 2. Our reasoning in denying the Members' third party beneficiary claims also requires rejection of their alternative argument that the tolling agreement itself covers Caguas, on whose behalf they are suing. Caguas was not a party to that agreement, and it did not become one merely because any recovery the Resolution Trust Corporation might obtain on Caguas' claims would be for Caguas' benefit. As pointed out above, the purpose of the tolling agreement was to freeze the situation until Winstar was finally determined, in the hope that thereafter the remaining supervisory Goodwill Claims that the Resolution Trust Corporation possessed--including those of Caguas--could be amicably settled without litigation. The tolling agreement was not intended to facilitate litigation in the interim by savings and loans institutions themselves.
 
 
 29
 The Members contend that the Court of Federal Claims erred in not deciding whether they could assert these claims derivatively on behalf of Caguas since Caguas' receiver (the Federal Deposit Insurance Corporation, successor to the Resolution Trust Corporation) failed to institute suit on them because of its conflict of interest. They argue that because of this conflict, they may step into the shoes of the receiver and assert on behalf of Caguas the claims that the receiver should have, but improperly failed to assert. Once again, for the reasons already given, the tolling agreement does not cover such a suit. If the Federal Deposit Insurance Corporation has been derelict in the performance of its duties to Caguas, as the Members complain, the proper remedy would have been a suit against the Federal Deposit Insurance Company, not one against the United States.
 
 
 30
 C. In the Court of Federal Claims, the statute of limitations is jurisdictional, because filing within the six-year period was a condition of the waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491(a)(1). See Hopland Band of Pomo Indian v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988). The complaint in this case was not filed within six years of the accrual of the claims asserted, and that period has not been tolled. Accordingly, the Court of Federal Claims had no jurisdiction to entertain the complaint, and properly dismissed it for lack of jurisdiction.
 
 
 31
 In view of our disposition of the case, it is unnecessary for us to address the question whether the statute of limitations applicable to the Court of Federal Claims is waivable by the Government, as was done under the tolling agreement here. Thus, we offer no opinion on that question.
 
 CONCLUSION
 
 32
 The judgment of the Court of Federal Claims dismissing the complaint is
 
 
 33
 AFFIRMED.